# SULLIVAN,

## JULY TERM, A. D. 1850.

## TRUE v. RANNEY.

A marriage will be invalid if one of the parties be so imbecile as not to understand the nature of the contract.

The consent of the parties is necessary in order to render the contract valid.

As a general rule, the validity of a contract of marriage depends on the *lex loci contractus*.

But the rule does not apply where the *lex loci* is opposed to the religion, morality, or municipal institutions of the country in which it is sought to be applied.

Nor would it apply if the *lex loci* recognized as valid, a marriage entered into by a person *non compos mentis*.

A young woman, who had not understanding enough to perform the ordinary duties of life, left this State secretly with a man, and the parties were then married in the State of Vermont. *Held*, that the marriage was invalid.

PETITION for a decree of nullity of marriage, prosecuted by the next friend of the petitioner.

It appeared, from the evidence, that the petitioner resided in Plainfield, in this county, with her parents, was over twenty-one years of age, and had a small property in her own right. She met Ranney secretly one evening, and they went together into the state of Vermont, where the marriage was solemnized. She afterwards returned to her father's house, and this proceeding was thereupon instituted.

It also appeared, from the evidence, that she could not wash nor dress herself properly and decently; that she went to the district school until she was about twenty years old, but could not spell, and could hardly read at all, and could not add nor subtract figures, nor state the number of Sabbaths in the year,

True *v.* Ranney.

nor tell the time of day by a watch, and could be taught nothing of Geography. She could not distinguish one piece of money from another, and had no idea of the value of property. She thought one of her father's cows was worth $200 or $300, and one of his horses was worth $300 or $400. She could not knit, nor sew, nor take care of her clothes. She could not be taught to do household work of any kind, nor cooking. She said at one time, that it would require five hours, and at another time, twelve hours, to get a boiled dinner, and that if she dined at twelve o'clock, she must begin to get dinner at twelve. She could not set the table for dinner, but would put the breakfast cups and saucers upon the table. She could not distinguish colors, nor cotton from flannel, nor count beyond twenty, nor be trusted to go on errands. She played with children four or five years old, and with their toys. She asked whether apples did not grow upon elm trees. At school she spoke of matters to the master, which females of her age would not allude to.

*Blaisdell,* for the petitioner.

*Cushing,* and *Metcalf,* for the respondent.

GILCHRIST, C. J. Allusion is made to a decree of " divorce or nullity " by this court in the Revised Statutes, ch. 148, §§ 2, 12, and 13. No mode is prescribed either in the constitution, or the statutes, in which proceedings shall be instituted and carried on, for the purpose of procuring a decree of nullity of marriage ; but that the court have the power to make such a decree, and to regulate the mode of procedure, we think is beyond doubt. 2 Kent, Comm. 76. There is a provision in § 7, ch. 148, that every libel shall be signed by the libellant, if of sound mind, and of the age of legal consent, otherwise by the parent, guardian, or next friend of such libellant.

The consent of the parties is essential to the validity of all contracts ; and as marriage is a contract, it is essential to its validity, that the parties should understand the nature of the

agreement they are about to enter into. *Londonderry* v. *Chester*, 2 N. H. Rep. 278; *Clark* v. *Clark*, 10 N. H. Rep. 382; 1 Bl. Com. 433. In the case of *Turner* v. *Myers*, 1 Hagg. Cons. R. 416, 417, Lord *Stowell* said, a defect of capacity invalidates the contract of marriage, as well as any other contract. It is true, that there are some obscure dicta by the earlier commentators on the law, that the marriage of an insane person could not be invalidated on that account; founded on some notion that prevailed in the dark ages, of the mysterious nature of the contract of marriage, in which its spiritual nature almost entirely obliterated its civil character. In more modern times it has been considered in its proper light, as a civil contract, as well as a religious vow; and like all civil contracts will be invalidated by want of consent of capable persons. So in the case of *Browning* v. *Reane*, 2 Phill. R. 70, Sir J. *Nicholl*, after quoting Blackstone, said, " Here then the law, and the good sense of the law, are clearly laid down; want of reason must, of course, invalidate a contract, and the most important contract of life, the very essence of which is consent. If the incapacity be such that the party is incapable of understanding the nature of the contract itself, and incapable, from mental imbecility, of taking care of his or her own person, or property, such an individual cannot dispose of her person and property by the matrimonial contract, any more than by any other contract." A marriage *de facto*, under circumstances of privacy, inferring fraud and circumvention, between a person of weak and deranged mind, and the daughter of his trustee, and solicitor, who had great influence over him, and by whom he was clearly considered and treated as of unsound mind, was pronounced null and void. *Portsmouth* v. *Portsmouth*, 1 Hagg. 355.

The evidence in the case satisfies us, as we think it cannot fail to satisfy any reasonable man, that the petitioner was so imbecile, that she was entirely unable to understand the nature and obligation of the contract into which it was proposed she should enter. There is every reason to believe, that no person so lamentably imbecile as this young woman appears to be, could have the remotest idea of the meaning of a contract, for the

True *v.* Ranney.

performance of any of the ordinary duties of life, and still less of a contract of marriage.

The marriage ceremony was performed in the State of Vermont, and how far the *lex loci contractus* is to affect the obligation of the contract in a case like this, is a matter to be inquired into.

The doctrine of trying contracts, especially those of marriage, according to the laws of the country where they were made, is practised in all civilized countries, and is agreeable to the law of nations. It is the consent of all nations, it is the *jus gentium*, that the solemnities of the different nations with respect to marriages, should be observed, and that contracts of this kind are to be determined by the laws of the country where they are made. But, although this principle is of general obligation, nevertheless, like every other general rule, it is subject to some limitations. The rule holds only where it does not stand opposed to the religion, morality, or municipal institutions of the country in which it is sought to be applied. The rule will not be enforced to the danger of these, because it is the first duty and law of every state to preserve its religion pure, and its institutions entire. It has been said, by an eminent Scottish judge, that "A party who is domiciled here, cannot be permitted to import into this country a law peculiar to his own case, and which is in opposition to those great and important public laws, which our legislature has held to be essentially connected with the best interest of society." Lord Robertson Fergusson on Mar. & D. 397. Thus, the *lex loci* was not allowed to prevail where one of the parties was incapacitated by the law of his domicil from making the contract, and was not relieved from his incapacity by a transient visit to Scotland. One of the parties had been married before, and divorced in Scotland. At the time of the divorce and second marriage, he was domiciled in England. According to the law of England, the first marriage had not been dissolved, and, therefore, the party was incapable of contracting a second marriage. *Beazeley* v. *Beazeley*, 3 Hagg. 639. So, if a foreign state should allow marriages clearly incestuous by the law of nature, they would not be allowed to have

validity elsewhere. *Greenwood* v. *Curtis*, 6 Mass. 378 ; *Medway* v. *Needham*, 16 Mass. 157 ; *Putnam* v. *Putnam*, 8 Pick. 433.

We have no doubt, that the tribunals in Vermont would adjudge the ceremony of . marriage in this case to be of no binding force. Throughout the civilized world, the *consensus animorum*, the willing mind, is required as an essential attribute of this contract. But the intelligence was wanting, to enable the party to give consent. She acquiesced in what was done, but the acquiescence came from the lips only, and not from the mind. We are, therefore, of opinion, that there should be a decree of nullity of marriage.